(Slip Opinion)          OCTOBER TERM, 2005          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## JONES *v.* FLOWERS ET AL.

### CERTIORARI TO THE SUPREME COURT OF ARKANSAS

No. 04–1477.   Argued January 17, 2006—Decided April 26, 2006

Petitioner Jones continued to pay the mortgage on his Arkansas home after separating from his wife and moving elsewhere in the same city. Once the mortgage was paid off, the property taxes—which had been paid by the mortgage company—went unpaid, and the property was certified as delinquent.  Respondent Commissioner of State Lands mailed Jones a certified letter at the property's address, stating that unless he redeemed the property, it would be subject to public sale in two years.  Nobody was home to sign for the letter and nobody retrieved it from the post office within 15 days, so it was returned to the Commissioner, marked "unclaimed."  Two years later, the Commissioner published a notice of public sale in a local newspaper.  No bids were submitted, so the State negotiated a private sale to respondent Flowers.  Before selling the house, the Commissioner mailed another certified letter to Jones, which was also returned unclaimed. Flowers purchased the house and had an unlawful detainer notice delivered to the property.  It was served on Jones' daughter, who notified him of the sale.  He filed a state-court suit against respondents, alleging that the Commissioner's failure to provide adequate notice resulted in the taking of his property without due process.  Granting respondents summary judgment, the trial court concluded that Arkansas' tax sale statute, which sets out the notice procedure used here, complied with due process.  The State Supreme Court affirmed.

*Held:*

   1. When mailed notice of a tax sale is returned unclaimed, a State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so.  Pp. 4–12.

   (a) This Court has deemed notice constitutionally sufficient if it was reasonably calculated to reach the intended recipient when sent,

see, *e.g., Mullane* v. *Central Hanover Bank & Trust Co.,* 339 U. S. 306, 314, but has never addressed whether due process requires further efforts when the government becomes aware prior to the taking that its notice attempt has failed. Most Courts of Appeals and State Supreme Courts addressing this question have decided that the government must do more in such a case, and many state statutes require more than mailed notice in the first instance. Pp. 4–6.

(b) The means a State employs to provide notice "must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane,* 399 U. S.*,* at 315. The adequacy of a particular form of notice is assessed by balancing the State's interest against "the individual interest sought to be protected by the Fourteenth Amendment." *Id.,* at 314. Here, the evaluation concerns the adequacy of notice prior to the State's extinguishing a property owner's interest in a home. It is unlikely that a person who actually desired to inform an owner about an impending tax sale of a house would do nothing when a certified letter addressed to the owner is returned unclaimed. The sender would ordinarily attempt to resend the letter, if that is practical, especially given that it concerns the important and irreversible prospect of losing a house. The State may have made a reasonable calculation of how to reach Jones, but it had good reason to suspect when the notice was returned that Jones was no better off than if no notice had been sent. The government must consider unique information about an intended recipient regardless of whether a statutory scheme is reasonably calculated to provide notice in the ordinary case. See *Robinson* v. *Hanrahan,* 409 U. S. 38, 40 *(per curiam),* and *Covey* v. *Town of Somers*, 351 U. S. 141, 146–147. It does not matter that the State in each of those cases was aware of the information *before* it calculated the best way to send notice. Knowledge that notice was ineffective was one of the "practicalities and peculiarities of the case" taken into account, *Mullane, supra,* at 314–315, and it should similarly be taken into account in assessing the adequacy of notice here. The Commissioner and Solicitor General correctly note the constitutionality of that a particular notice procedure is assessed *ex ante*, not *post hoc.* But if a feature of the State's procedure is that it promptly provides additional information to the government about the effectiveness of attempted notice, the *ex ante* principle is not contravened by considering what the government does with that information. None of the Commissioner's additional contentions—that notice was sent to an address that Jones provided and had a legal obligation to keep updated, that a property owner who fails to receive a property tax bill and pay taxes is on inquiry notice that his property is subject to governmental taking, and that Jones was obliged to ensure that those in whose hands he left his

property would alert him if it was in jeopardy—relieves the State of its constitutional obligation to provide adequate notice. Pp. 7–12.

　2. Because additional reasonable steps were available to the State, given the circumstances here, the Commissioner's effort to provide notice to Jones was insufficient to satisfy due process. What is reasonable in response to new information depends on what that information reveals. The certified letter's return "unclaimed" meant either that Jones was not home when the postman called and did not retrieve the letter or that he no longer resided there. One reasonable step addressed to the former possibility would be for the State to resend the notice by regular mail, which requires no signature. Certified mail makes actual notice more likely only if someone is there to sign for the letter or tell the mail carrier that the address is incorrect. Regular mail can be left until the person returns home, and might increase the chances of actual notice. Other reasonable follow-up measures would have been to post notice on the front door or address otherwise undeliverable mail to "occupant." Either approach would increase the likelihood that any occupants would alert the owner, if only because an ownership change could affect their own occupancy. Contrary to Jones' claim, the Commissioner was not required to search the local phone book and other government records. Such an open-ended search imposes burdens on the State significantly greater than the several relatively easy options outlined here. The Commissioner's complaint about the burden of even these additional steps is belied by Arkansas' requirement that notice to homestead owners be accomplished by personal service if certified mail is returned and by the fact that the State transfers the cost of notice to the taxpayer or tax sale purchaser. The Solicitor General's additional arguments— that posted notice could be removed by children or vandals, and that the follow-up requirement will encourage States to favor modes of delivery that will not generate additional information—are rejected. This Court will not prescribe the form of service that Arkansas should adopt. Arkansas can determine how best to proceed, and the States have taken a variety of approaches. Pp. 12–17.

359 Ark. 443, \_\_\_ S. W. 3d \_\_\_, reversed and remanded.

　ROBERTS, C. J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA and KENNEDY, JJ., joined. ALITO, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 04–1477

———————

## GARY KENT JONES, PETITIONER *v.* LINDA K. FLOWERS ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF ARKANSAS

[April 26, 2006]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Before a State may take property and sell it for unpaid taxes, the Due Process Clause of the Fourteenth Amendment requires the government to provide the owner "notice and opportunity for hearing appropriate to the nature of the case." *Mullane* v. *Central Hanover Bank & Trust Co.,* 339 U. S. 306, 313 (1950). We granted certiorari to determine whether, when notice of a tax sale is mailed to the owner and returned undelivered, the government must take additional reasonable steps to provide notice before taking the owner's property.

I

In 1967, petitioner Gary Jones purchased a house at 717 North Bryan Street in Little Rock, Arkansas. He lived in the house with his wife until they separated in 1993. Jones then moved into an apartment in Little Rock, and his wife continued to live in the North Bryan Street house. Jones paid his mortgage each month for 30 years, and the mortgage company paid Jones' property taxes. After Jones paid off his mortgage in 1997, the property taxes

went unpaid, and the property was certified as delinquent.

In April 2000, respondent Mark Wilcox, the Commissioner of State Lands (Commissioner), attempted to notify Jones of his tax delinquency, and his right to redeem the property, by mailing a certified letter to Jones at the North Bryan Street address. See Ark. Code Ann. §26–37–301 (1997). The packet of information stated that unless Jones redeemed the property, it would be subject to public sale two years later on April 17, 2002. See *ibid.* Nobody was home to sign for the letter, and nobody appeared at the post office to retrieve the letter within the next 15 days. The post office returned the unopened packet to the Commissioner marked "'unclaimed.'" Pet. for Cert. 3.

Two years later, and just a few weeks before the public sale, the Commissioner published a notice of public sale in the Arkansas Democrat Gazette. No bids were submitted, which permitted the State to negotiate a private sale of the property. See §26–37–202(b). Several months later, respondent Linda Flowers submitted a purchase offer. The Commissioner mailed another certified letter to Jones at the North Bryan Street address, attempting to notify him that his house would be sold to Flowers if he did not pay his taxes. Like the first letter, the second was also returned to the Commissioner marked "unclaimed." *Ibid.* Flowers purchased the house, which the parties stipulated in the trial court had a fair market value of $80,000, for $21,042.15. Record 224. Immediately after the 30-day period for postsale redemption passed, see §26–37–202(e), Flowers had an unlawful detainer notice delivered to the property. The notice was served on Jones' daughter, who contacted Jones and notified him of the tax sale. *Id.,* at 11 (Exh. B).

Jones filed a lawsuit in Arkansas state court against the Commissioner and Flowers, alleging that the Commissioner's failure to provide notice of the tax sale and of Jones' right to redeem resulted in the taking of his prop-

erty without due process. The Commissioner and Flowers moved for summary judgment on the ground that the two unclaimed letters sent by the Commissioner were a constitutionally adequate attempt at notice, and Jones filed a cross-motion for summary judgment. The trial court granted summary judgment in favor of the Commissioner and Flowers. App. to Pet. for Cert. 12a–13a. It concluded that the Arkansas tax sale statute, which set forth the notice procedure followed by the Commissioner, complied with constitutional due process requirements.

Jones appealed, and the Arkansas Supreme Court affirmed the trial court's judgment. 359 Ark. 443, \_\_\_ S. W. 3d \_\_\_ (2004). The court noted our precedent stating that due process does not require actual notice, see *Dusenbery* v. *United States,* 534 U. S. 161, 170 (2002), and it held that attempting to provide notice by certified mail satisfied due process in the circumstances presented, 359 Ark., at \_\_\_, \_\_\_ S. W. 3d, at \_\_\_.

We granted certiorari, 545 U. S. \_\_\_ (2005), to resolve a conflict among the Circuits and State Supreme Courts concerning whether the Due Process Clause requires the government to take additional reasonable steps to notify a property owner when notice of a tax sale is returned undelivered. Compare, *e.g., Akey* v. *Clinton County*, 375 F. 3d 231, 236 (CA2 2004) ("In light of the notice's return, the County was required to use 'reasonably diligent efforts' to ascertain Akey's correct address"), and *Kennedy* v. *Mossafa*, 100 N. Y. 2d 1, 9, 789 N. E. 2d 607, 611 (2003) ("[W]e reject the view that the enforcing officer's obligation is always satisfied by sending the notice to the address listed in the tax roll, even where the notice is returned as undeliverable"), with *Smith* v. *Cliffs on the Bay Condominium Assn.*, 463 Mich. 420, 429, 617 N. W. 2d 536, 541 (2000) *(per curiam)* ("The fact that one of the mailings was returned by the post office as undeliverable does not impose on the state the obligation to undertake an investigation

to see if a new address . . . could be located"). We hold that when mailed notice of a tax sale is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so. Under the circumstances presented here, additional reasonable steps were available to the State. We therefore reverse the judgment of the Arkansas Supreme Court.

## II

### A

Due process does not require that a property owner receive actual notice before the government may take his property. *Dusenbery*, *supra*, at 170. Rather, we have stated that due process requires the government to provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U. S., at 314. The Commissioner argues that once the State provided notice reasonably calculated to apprise Jones of the impending tax sale by mailing him a certified letter, due process was satisfied. The Arkansas statutory scheme is reasonably calculated to provide notice, the Commissioner continues, because it provides for notice by certified mail to an address that the property owner is responsible for keeping up to date. See Ark. Code Ann. §26–35–705 (1997). The Commissioner notes this Court's ample precedent condoning notice by mail, see, *e.g., Dusenbery, supra,* at 169; *Tulsa Professional Collection Services, Inc.* v. *Pope,* 485 U. S. 478, 490 (1988); *Mennonite Bd. of Missions* v. *Adams,* 462 U. S. 791, 798 (1983); *Mullane*, *supra*, at 318–319, and adds that the Arkansas scheme exceeds constitutional requirements by requiring the Commissioner to use certified mail. Brief for Respondent Commissioner 14–15.

It is true that this Court has deemed notice constitu-

tionally sufficient if it was reasonably calculated to reach the intended recipient when sent. See, *e.g., Dusenbery, supra*, at 168–169; *Mullane*, 339 U. S., at 314. In each of these cases, the government attempted to provide notice and heard nothing back indicating that anything had gone awry, and we stated that "[t]he reasonableness and hence the constitutional validity of [the] chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected." *Id.,* at 315; see also *Dusenbery*, *supra*, at 170. But we have never addressed whether due process entails further responsibility when the government becomes aware prior to the taking that its attempt at notice has failed. That is a new wrinkle, and we have explained that the "notice required will vary with circumstances and conditions." *Walker* v. *City of Hutchinson,* 352 U. S. 112, 115 (1956). The question presented is whether such knowledge on the government's part is a "circumstance and condition" that varies the "notice required."

The Courts of Appeals and State Supreme Courts have addressed this question on frequent occasions, and most have decided that when the government learns its attempt at notice has failed, due process requires the government to do something more before real property may be sold in a tax sale.[1] See, *e.g., Plemons* v. *Gale*, 396 F. 3d 569, 576

———————
[1] Most Courts of Appeals have also concluded that the Due Process Clause of the Fifth Amendment requires the Federal Government to take further reasonable steps in the property forfeiture context. See, *e.g., United States* v. *Ritchie*, 342 F. 3d 903, 911 (CA9 2003); *Foehl* v. *United States*, 238 F. 3d 474, 480 (CA3 2001); *Small* v. *United States*, 136 F. 3d 1334, 1337–1338 (CADC 1998); *Torres* v. *$36,256.80 U. S. Currency*, 25 F. 3d 1154, 1161 (CA2 1994); *Barrera-Montenegro* v. *United States*, 74 F. 3d 657, 660 (CA5 1996); *United States* v. *Rodgers*, 108 F. 3d 1247, 1252–1253 (CA10 1997); see also *Garcia* v. *Meza*, 235 F. 3d 287, 291 (CA7 2000) (declining to adopt a *per se* rule that only examines notice at the time it is sent, but also declining to impose an affirmative duty to seek out claimants in every case where notice is returned undelivered). But see

(CA4 2005); *Akey*, 375 F. 3d, at 236; *Hamilton* v. *Renewed Hope, Inc.*, 277 Ga. 465, 468, 589 S. E. 2d 81, 85 (2003); *Kennedy*, 100 N. Y. 2d, at 9, 789 N. E. 2d, at 611; *Malone* v. *Robinson*, 614 A. 2d 33, 38 (D. C. App. 1992); *St. George Antiochian Orthodox Christian Church* v. *Aggarwal*, 326 Md. 90, 103, 603 A. 2d 484, 490 (1992); *Wells Fargo Credit Corp.* v. *Ziegler*, 780 P. 2d 703, 705 (Okla. 1989); *Rosenberg* v. *Smidt*, 727 P. 2d 778, 780–783 (Alaska 1986); *Giacobbi* v. *Hall*, 109 Idaho 293, 297, 707 P. 2d 404, 408 (1985); *Tracy* v. *County of Chester, Tax Claim Bureau,* 507 Pa. 288, 296, 489 A. 2d 1334, 1338–1339 (1985). But see *Smith*, 463 Mich., at 429, 617 N. W. 2d, at 541; *Dahn* v. *Trownsell*, 1998 SD 36, ¶23, 576 N. W. 2d 535, 541–542; *Elizondo* v. *Read*, 588 N. E. 2d 501, 504 (Ind. 1992); *Atlantic City* v. *Block C–11, Lot 11*, 74 N. J. 34, 39–40, 376 A. 2d 926, 928 (1977). Many States already require in their statutes that the government do more than simply mail notice to delinquent owners, either at the outset or as a followup measure if initial mailed notice is ineffective.[2]

_____

*Madewell* v. *Downs*, 68 F. 3d 1030, 1047 (CA8 1995); *Sarit* v. *United States Drug Enforcement Admin.*, 987 F. 2d 10, 14–15 (CA1 1993).

[2] Many States require that notice be given to the occupants of the property as a matter of course. See Cal. Rev. & Tax. Code Ann. §3704.7 (West Supp. 2006); Ga. Code Ann. §48–4–45(a)(1)(B) (Supp. 2005); Ill. Comp. Stat., ch. 35, §§200/21–75(a), 200/22–10, 200/22–15 (West 2004); Me. Rev. Stat. Ann., Tit. 36, §1073 (1990); Md. Tax-Prop. Code Ann. §14–836(b)(4)(i)(2) (Lexis 2001); Mich. Comp. Laws Ann. §211.78i(3) (West 2005); Minn. Stat. §281.23(6) (2004); Mont. Code Ann. §§15–18–212(1)(a), (2)(A) (2005); N. D. Cent. Code Ann. §57–28–04(3) (Lexis 2005); Okla. Stat., Tit. 68, §3118(A) (West Supp. 2006); S. D. Codified Laws §10–25–5 (2004); Utah Code Ann. §59–2–1351(2)(a) (Lexis 2004); Wis. Stat. §75.12(1) (2003–2004); Wyo. Stat. Ann. §39–13–108(e)(v)(B) (2005). Some States require that notice be posted on the property or at the property owner's last known address either at the outset, see Del. Code Ann., Tit. 9, §§8724, 8772 (1989 and Supp. 2004); Ga. Code Ann. §48–4–78(d) (Supp. 2005); Haw. Rev. Stat. §246–56 (2003); Md. Tax-Prop. Code Ann. §14–836(b)(6) (Lexis 2001); Okla. Stat., Tit. 68, §3118(A) (West Supp. 2006), or as a followup measure when personal

Opinion of the Court

In *Mullane*, we stated that "when notice is a person's due . . . [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," 339 U. S., at 315, and that assessing the adequacy of a particular form of notice requires balancing the "interest of the State" against "the individual interest sought to be protected by the Fourteenth Amendment," *id.*, at 314. Our leading cases on notice have evaluated the adequacy of notice given to beneficiaries of a common trust fund, *Mullane*, *supra;* a mortgagee, *Mennonite*, 462 U. S. 791; owners of seized cash and automobiles, *Dusenbery,* 534 U. S. 161; *Robinson* v. *Hanrahan,* 409 U. S. 38 (1972) *(per curiam);* creditors of an estate, *Tulsa Professional*, 485 U. S. 478; and tenants living in public housing, *Greene* v. *Lindsey,* 456 U. S. 444 (1982). In this case, we evaluate the adequacy of notice prior to the State extinguishing a property owner's interest in a home.

We do not think that a person who actually desired to inform a real property owner of an impending tax sale of a house he owns would do nothing when a certified letter sent to the owner is returned unclaimed. If the Commissioner prepared a stack of letters to mail to delinquent

––––––––––

service cannot be accomplished or certified mail is returned, see Fla. Stat. §197.522(2)(a) (2003); Minn. Stat. §281.23(6) (2004); S. C. Code Ann. §12–51–40(c) (Supp. 2005). And a few States require a diligent inquiry to find a property owner's correct address when mailed notice is returned. See Miss. Code Ann. §27–43–3 (2002); Nev. Rev. Stat. §361.595(3)(b) (2003); Pa. Stat. Ann., Tit. 72, §5860.607a (Purdon 1990); R. I. Gen. Laws §44–9–25.1 (2005).

See also 26 U. S. C. §6335(a) (requiring the Internal Revenue Service to make a reasonable attempt to personally serve notice on a delinquent taxpayer before relying upon notice by certified mail); 28 U. S. C. §3203(g)(1)(A)(i)(IV) (requiring written notice to tenants of real property subject to sale under the Federal Debt Collection Practices Act); 12 U. S. C. §3758(2)(A)(iii) (requiring written notice to occupants before foreclosure by the Secretary of Housing and Urban Development); §3758(2)(B)(ii) (requiring that notice be posted on the property if occupants are unknown).

taxpayers, handed them to the postman, and then watched as the departing postman accidentally dropped the letters down a storm drain, one would certainly expect the Commissioner's office to prepare a new stack of letters and send them again. No one "desirous of actually informing" the owners would simply shrug his shoulders as the letters disappeared and say "I tried." Failure to follow up would be unreasonable, despite the fact that the letters were reasonably calculated to reach their intended recipients when delivered to the postman.

By the same token, when a letter is returned by the post office, the sender will ordinarily attempt to resend it, if it is practicable to do so. See *Small* v. *United States*, 136 F. 3d 1334, 1337 (CADC 1998). This is especially true when, as here, the subject matter of the letter concerns such an important and irreversible prospect as the loss of a house. Although the State may have made a reasonable calculation of how to reach Jones, it had good reason to suspect when the notice was returned that Jones was "no better off than if the notice had never been sent." *Malone*, *supra,* at 37. Deciding to take no further action is not what someone "desirous of actually informing" Jones would do; such a person would take further reasonable steps if any were available.

In prior cases, we have required the government to consider unique information about an intended recipient regardless of whether a statutory scheme is reasonably calculated to provide notice in the ordinary case. In *Robinson* v. *Hanrahan,* we held that notice of forfeiture proceedings sent to a vehicle owner's home address was inadequate when the State knew that the property owner was in prison. 409 U. S., at 40. In *Covey* v. *Town of Somers*, 351 U. S. 141 (1956), we held that notice of foreclosure by mailing, posting, and publication was inadequate when town officials knew that the property owner was incompetent and without a guardian's protection. *Id.*, at

146–147.

The Commissioner points out that in these cases, the State was aware of such information *before* it calculated how best to provide notice. But it is difficult to explain why due process would have settled for something less if the government had learned after notice was sent, but before the taking occurred, that the property owner was in prison or was incompetent. Under *Robinson* and *Covey*, the government's knowledge that notice pursuant to the normal procedure was ineffective triggered an obligation on the government's part to take additional steps to effect notice. That knowledge was one of the "practicalities and peculiarities of the case," *Mullane, supra,* at 314–315, that the Court took into account in determining whether constitutional requirements were met. It should similarly be taken into account in assessing the adequacy of notice in this case. The dissent dismisses the State's knowledge that its notice was ineffective as "learned long after the fact," *post*, at 7, n. 5 (opinion of THOMAS, J.), but the notice letter was promptly returned to the State two to three weeks after it was sent, and the Arkansas statutory regime precludes the State from taking the property for two *years* while the property owner may exercise his right to redeem, see Ark. Code Ann. §26–37–301 (Supp. 2005).

It is certainly true, as the Commissioner and Solicitor General contend, that the failure of notice in a specific case does not establish the inadequacy of the attempted notice; in that sense, the constitutionality of a particular procedure for notice is assessed *ex ante*, rather than *post hoc*. But if a feature of the State's chosen procedure is that it promptly provides additional information to the government about the effectiveness of notice, it does not contravene the *ex ante* principle to consider what the government does with that information in assessing the adequacy of the chosen procedure. After all, the State knew *ex ante* that it would promptly learn whether its

effort to effect notice through certified mail had succeeded. It would not be inconsistent with the approach the Court has taken in notice cases to ask, with respect to a procedure under which telephone calls were placed to owners, what the State did when no one answered. Asking what the State does when a notice letter is returned unclaimed is not substantively different.

The Commissioner has three further arguments for why reasonable followup measures were not required in this case. First, notice was sent to an address that Jones provided and had a legal obligation to keep updated. See Ark. Code Ann. §26–35–705 (1997). Second, "after failing to receive a property tax bill and pay property taxes, a property holder is on inquiry-notice that his property is subject to governmental taking." Brief for Respondent Commissioner 18–19. Third, Jones was obliged to ensure that those in whose hands he left his property would alert him if it was in jeopardy. None of these contentions relieves the State of its constitutional obligation to provide adequate notice.

The Commissioner does not argue that Jones' failure to comply with a statutory obligation to keep his address updated forfeits his right to constitutionally sufficient notice, and we agree. *Id.*, at 19; see also Brief for United States as *Amicus Curiae* 16, n. 5 (quoting *Mennonite*, 462 U. S., at 799 ("'[A] party's ability to take steps to safeguard its own interests does not relieve the State of its constitutional obligation'")). In *Robinson*, we noted that Illinois law required each vehicle owner to register his address with the secretary of state, and that the State's vehicle forfeiture scheme provided for notice by mail to the address listed in the secretary's records. See 409 U. S., at 38, n. 1 (citing Ill. Rev. Stat., ch. 95½, §3–405 (1971), and ch. 38, §36–1 (1969)). But we found that the State had not provided constitutionally sufficient notice, despite having followed its reasonably calculated scheme, because it knew

that Robinson could not be reached at his address of re-
cord. 409 U. S., at 31–32. Although Ark. Code Ann. §26–
35–705 provides strong support for the Commissioner's
argument that mailing a certified letter to Jones at 717
North Bryan Street was reasonably calculated to reach
him, it does not alter the reasonableness of the Commis-
sioner's position that he must do nothing more when the
notice is promptly returned "unclaimed."

As for the Commissioner's inquiry notice argument, the
common knowledge that property may become subject to
government taking when taxes are not paid does not
excuse the government from complying with its constitu-
tional obligation of notice before taking private property.
We have previously stated the opposite: An interested
party's "knowledge of delinquency in the payment of taxes
is not equivalent to notice that a tax sale is pending."
*Mennonite, supra,* at 800. It is at least as widely known
that arrestees have the right to remain silent, and that
anything they say may be used against them, see
*Dickerson* v. *United States,* 530 U. S. 428, 443 (2000)
("*Miranda* [v. *Arizona,* 384 U. S. 436 (1966),] has become
embedded in routine police practice to the point where the
warnings have become part of our national culture"), but
that knowledge does not excuse a police failure to provide
*Miranda* warnings. Arkansas affords even a delinquent
taxpayer the right to settle accounts with the State and
redeem his property, so Jones' failure to pay his taxes in a
timely manner cannot by itself excuse inadequate notice.

Finally, the Commissioner reminds us of a statement
from *Mullane* that the State can assume an owner leaves
his property in the hands of one who will inform him if his
interest is in jeopardy. 339 U. S., at 316. But in this
passage, Justice Jackson writes of "libel of a ship, attach-
ment of a chattel[,] or entry upon real estate in the name
of law"—such "seiz[ures]" of property, he concluded, "may
reasonably be expected to come promptly to the owner's

attention." *Ibid.* An occupant, however, is not charged with acting as the owner's agent in all respects, and it is quite a leap from Justice Jackson's examples to conclude that it is an obligation of tenancy to follow up with certified mail of unknown content addressed to the owner. In fact, the State makes it impossible for the occupant to learn why the Commissioner is writing the owner, because an occupant cannot call for a certified letter without first obtaining the owner's signature. For all the occupant knows, the Commissioner of State Lands might write to certain residents about a variety of matters he finds important, such as state parks or highway construction; it would by no means be obvious to an occupant observing a certified mail slip from the Commissioner that the owner is in danger of losing his property. In any event, there is no record evidence that notices of attempted delivery were left at 717 North Bryan Street.

Mr. Jones should have been more diligent with respect to his property, no question. People must pay their taxes, and the government may hold citizens accountable for tax delinquency by taking their property. But before forcing a citizen to satisfy his debt by forfeiting his property, due process requires the government to provide adequate notice of the impending taking. U. S. Const., Amdt. 14; *Mennonite, supra*, at 799.

### B

In response to the returned form suggesting that Jones had not received notice that he was about to lose his property, the State did—nothing. For the reasons stated, we conclude the State should have taken additional reasonable steps to notify Jones, if practicable to do so. The question remains whether there were any such available steps. While "[i]t is not our responsibility to prescribe the form of service that the [government] should adopt," *Greene,* 456 U. S., at 455, n. 9, if there were no reasonable addi-

tional steps the government could have taken upon return of the unclaimed notice letter, it cannot be faulted for doing nothing.

We think there were several reasonable steps the State could have taken. What steps are reasonable in response to new information depends upon what the new information reveals. The return of the certified letter marked "unclaimed" meant either that Jones still lived at 717 North Bryan Street, but was not home when the postman called and did not retrieve the letter at the post office, or that Jones no longer resided at that address. One reasonable step primarily addressed to the former possibility would be for the State to resend the notice by regular mail, so that a signature was not required. The Commissioner says that use of certified mail makes actual notice more likely, because requiring the recipient's signature protects against misdelivery. But that is only true, of course, when someone is home to sign for the letter, or to inform the mail carrier that he has arrived at the wrong address. Otherwise, "[c]ertified mail is dispatched and handled in transit as ordinary mail," United States Postal Service, Domestic Mail Manual §503.3.2.1 (Mar. 16, 2006), and the use of certified mail might make actual notice less likely in some cases—the letter cannot be left like regular mail to be examined at the end of the day, and it can only be retrieved from the post office for a specified period of time. Following up with regular mail might also increase the chances of actual notice to Jones if—as it turned out—he had moved. Even occupants who ignored certified mail notice slips addressed to the owner (if any had been left) might scrawl the owner's new address on the notice packet and leave it for the postman to retrieve, or notify Jones directly.

Other reasonable followup measures, directed at the possibility that Jones had moved as well as that he had simply not retrieved the certified letter, would have been

to post notice on the front door, or to address otherwise undeliverable mail to "occupant." Most States that explicitly outline additional procedures in their tax sale statutes require just such steps. See n. 2, *supra.* Either approach would increase the likelihood that the owner would be notified that he was about to lose his property, given the failure of a letter deliverable only to the owner in person. That is clear in the case of an owner who still resided at the premises. It is also true in the case of an owner who has moved: Occupants who might disregard a certified mail slip not addressed to them are less likely to ignore posted notice, and a letter addressed to them (even as "occupant") might be opened and read. In either case, there is a significant chance the occupants will alert the owner, if only because a change in ownership could well affect their own occupancy. In fact, Jones first learned of the State's effort to sell his house when he was alerted by one of the occupants—his daughter—after she was served with an unlawful detainer notice.

Jones believes that the Commissioner should have searched for his new address in the Little Rock phonebook and other government records such as income tax rolls. We do not believe the government was required to go this far. As the Commissioner points out, the return of Jones' mail marked "unclaimed" did not necessarily mean that 717 North Bryan Street was an incorrect address; it merely informed the Commissioner that no one appeared to sign for the mail before the designated date on which it would be returned to the sender. An open-ended search for a new address—especially when the State obligates the taxpayer to keep his address updated with the tax collector, see Ark. Code Ann. §26–35–705 (1997)—imposes burdens on the State significantly greater than the several relatively easy options outlined above.

The Commissioner complains about the burden of even those additional steps, but his argument is belied by Ar-

kansas' current requirement that notice to homestead owners be accomplished by personal service if certified mail is returned, §26–37–301(e) (Supp. 2005), and the fact that Arkansas transfers the cost of notice to the taxpayer or the tax sale purchaser, §26–37–104(a). The Commissioner has offered no estimate of how many notice letters are returned, and no facts to support the dissent's assertion that the Commissioner must now physically locate "tens of thousands of properties every year." *Post*, at 10. Citing our decision in *Greene* v. *Lindsey,* the Solicitor General adds that posted notice could be taken down by children or vandals. But in *Greene*, we noted that outside the specific facts of that case, posting notice on real property is "a singularly appropriate and effective way of ensuring that a person . . . is actually apprised of proceedings against him." 456 U. S., at 452–453. Successfully providing notice is often the most efficient way to collect unpaid taxes, see *Mennonite*, 462 U. S., at 800, n. 5 (more effective notice may ease burden on State if recipient arranges to pay delinquent taxes prior to tax sale); Tr. of Oral Arg. 24 (85 percent of tax delinquent properties in Arkansas are redeemed upon notice of delinquency), but rather than taking relatively easy additional steps to effect notice, the State undertook the burden and expense of purchasing a newspaper advertisement, conducting an auction, and then negotiating a private sale of the property to Flowers.

The Solicitor General argues that requiring further effort when the government learns that notice was not delivered will cause the government to favor modes of providing notice that do not generate additional information—for example, starting (and stopping) with regular mail instead of certified mail. We find this unlikely, as we have no doubt that the government repeatedly finds itself being asked to prove that notice was sent and received. Using certified mail provides the State with documenta-

tion of personal delivery and protection against false claims that notice was never received. That added security, however, comes at a price—the State also learns when notice has *not* been received. We conclude that, under the circumstances presented, the State cannot simply ignore that information in proceeding to take and sell the owner's property—any more than it could ignore the information that the owner in *Robinson* was in jail, or that the owner in *Covey* was incompetent.

Though the Commissioner argues that followup measures are not constitutionally required, he reminds us that the State did make some attempt to follow up with Jones by publishing notice in the newspaper a few weeks before the public sale. Several decades ago, this Court observed that "[c]hance alone" brings a person's attention to "an advertisement in small type inserted in the back pages of a newspaper," *Mullane*, 339 U. S., at 315, and that notice by publication is adequate only where "it is not reasonably possible or practicable to give more adequate warning," *id.*, at 317. Following up by publication was not constitutionally adequate under the circumstances presented here because, as we have explained, it was possible and practicable to give Jones more adequate warning of the impending tax sale.

The dissent forcefully articulates some basic principles about constitutionally required notice, principles from which we have no intention to depart. In particular, we disclaim any "new rule" that is "contrary to *Dusenbery* and a significant departure from *Mullane*." *Post*, at 6. In *Dusenbery*, the Government was aware that someone at the prison had signed for the prisoner's notice letter, and we determined that this attempt at notice was adequate, despite the fact that the State could have made notice more likely by requiring the prisoner to sign for the letter himself. 534 U. S., at 171. In this case, of course, the notice letter was returned to the Commissioner, informing

him that his attempt at notice had failed.

As for *Mullane*, it directs that "when notice is a person's due . . . [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." 339 U. S., at 315. Mindful of the dissent's concerns, we conclude, at the end of the day, that someone who actually wanted to alert Jones that he was in danger of losing his house would do more when the attempted notice letter was returned unclaimed, and there was more that reasonably could be done.

As noted, "[i]t is not our responsibility to prescribe the form of service that the [government] should adopt." *Greene, supra,* at 455, n. 9. In prior cases finding notice inadequate, we have not attempted to redraft the State's notice statute. See, *e.g., Tulsa Professional*, 485 U. S., at 490–491; *Robinson*, 409 U. S., at 40; *Schroeder* v. *City of New York,* 371 U. S. 208, 213–214 (1962); *Walker*, 352 U. S., at 116; *Covey*, 351 U. S., at 146–147. The State can determine how to proceed in response to our conclusion that notice was inadequate here, and the States have taken a variety of approaches to the present question. See n. 2, *supra.* It suffices for present purposes that we are confident that additional reasonable steps were available for Arkansas to employ before taking Jones' property.

\*   \*   \*

There is no reason to suppose that the State will ever be less than fully zealous in its efforts to secure the tax revenue it needs. The same cannot be said for the State's efforts to ensure that its citizens receive proper notice before the State takes action against them. In this case, the State is exerting extraordinary power against a property owner—taking and selling a house he owns. It is not too much to insist that the State do a bit more to attempt to let him know about it when the notice letter addressed to him is returned unclaimed.

The Commissioner's effort to provide notice to Jones of an impending tax sale of his house was insufficient to satisfy due process given the circumstances of this case. The judgment of the Arkansas Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

_____

No. 04–1477

_____

## GARY KENT JONES, PETITIONER _v._ LINDA K. FLOWERS ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF ARKANSAS

[April 26, 2006]

JUSTICE THOMAS, with whom JUSTICE SCALIA and JUSTICE KENNEDY join, dissenting.

When petitioner failed to pay his property taxes for several consecutive years, respondent Commissioner of State Lands in Arkansas, using the record address that petitioner provided to the State, sent petitioner a letter by certified mail, noting his tax delinquency and explaining that his property would be subject to public sale if the delinquent taxes and penalties were not paid. After petitioner failed to respond, the State also published notice of the delinquency and public sale in an Arkansas newspaper. Soon after respondent Linda K. Flowers submitted a purchase offer to the State, it sent petitioner a second letter by certified mail explaining that the sale would proceed if the delinquent taxes and penalties were not paid.

Petitioner argues that the State violated his rights under the Due Process Clause of the Fourteenth Amendment because, in his view, the State failed to take sufficient steps to contact him before selling his property to Flowers. Petitioner contends that once the State became aware that he had not claimed the certified mail, it was constitutionally obligated to employ additional methods to locate him.

Adopting petitioner's arguments, the Court holds today that "when mailed notice of a tax sale is returned un-

claimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so." *Ante*, at 4. The Court concludes that it was practicable for Arkansas to take additional steps here—namely, notice by regular mail, posting notice on petitioner's door, and addressing mail to "occupant." *Ante*, at 13. Because, under this Court's precedents, the State's notice methods clearly satisfy the requirements of the Due Process Clause, I respectfully dissent.

I

The Fourteenth Amendment prohibits the States from "depriv[ing] any person of life, liberty, or property, without due process of law." This Court has held that a State must provide an individual with notice and opportunity to be heard before the State may deprive him of his property. *Mullane* v. *Central Hanover Bank & Trust Co.,* 339 U. S. 306, 313 (1950). Balancing a State's interest in efficiently managing its administrative system and an individual's interest in adequate notice, this Court has held that a State must provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Id.*, at 313–314. As this Court has explained, "when notice is a person's due . . . [t]he means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.*, at 315. "[H]eroic efforts," however, are not required. *Dusenbery* v. *United States,* 534 U. S. 161, 170 (2002). To the contrary, we have expressly rejected "[a] construction of the Due Process Clause which would place impossible or impractical obstacles in the way [of the State]." *Mullane, supra,* at 313–314. Thus, "none of our cases . . . has required actual notice"; instead, "we have allowed the Government to defend the 'reasonableness and hence the constitutional validity of any chosen method . . . on the ground

that it is in itself reasonably certain to inform those af-fected.'" *Dusenbery, supra,* at 169–170 (quoting *Mullane, supra,* at 315).

The methods of notice employed by Arkansas were rea-sonably calculated to inform petitioner of proceedings affecting his property interest and thus satisfy the re-quirements of the Due Process Clause. The State mailed a notice by certified letter to the address provided by peti-tioner. The certified letter was returned to the State marked "unclaimed" after three attempts to deliver it. The State then published a notice of public sale containing redemption information in the Arkansas Democrat Gazette newspaper. After Flowers submitted a purchase offer, the State sent yet another certified letter to petitioner at his record address. That letter, too, was returned to the State marked "unclaimed" after three delivery attempts.[1]

Arkansas' attempts to contact petitioner by certified mail at his "record address," without more, satisfy due process. *Dusenbery, supra,* at 169. See also *Mullane, supra,* at 318; *Tulsa Professional Collection Services, Inc.* v. *Pope,* 485 U. S. 478, 490 (1988) ("We have repeatedly recognized that mail service is an inexpensive and effi-cient mechanism that is reasonably calculated to provide actual notice"); *Mennonite Bd. of Missions* v. *Adams,* 462 U. S. 791, 792, 798 (1983) (holding that "notice *mailed* to [the affected party's] *last known available address*" is sufficient where a State seeks to sell "real property on

_____

[1] Though the Court posits that "there is no record evidence that no-tices of attempted delivery were left at 717 North Bryan Street," *ante,* at 12, the postal carrier was required to leave notice at the address at each delivery attempt indicating that delivery of certified mail had been attempted and that the mail could be retrieved at the local post office. See United States Postal Operations Manual §813.25 (July 2005), http://www.nalc.org/depart/can/pdf/manuals/pom/pomc8.pdf (all Inter-net materials as visited Apr. 21, 2006, and available in Clerk of Court's case file) ("The carrier must leave a notice of arrival on Form 3849 if the carrier cannot deliver the certifiable article for any reason").

which payments of property taxes have been delinquent" (emphasis added)). Because the notices were sent to the address provided by petitioner himself, the State had an especially sound basis for determining that notice would reach him. Moreover, Arkansas exceeded the constitutional minimum by additionally publishing notice in a local newspaper.[2] See *Mullane*, *supra,* at 318. Due process requires nothing more—and certainly not here, where petitioner had a statutory duty to pay his taxes and to report any change of address to the state taxing authority. See Ark. Code Ann. §26–35–705 (1997).

My conclusion that Arkansas' notice methods satisfy due process is reinforced by the well-established presumption that individuals, especially those owning property, act in their own interest. Recognizing that "'[i]t is the part of common prudence for all those who have any interest in [a thing], to guard that interest by persons who are in a situation to protect it,'" *Mullane*, *supra*, at 316 (quoting *The Mary*, 9 Cranch 126, 144 (1815)), this Court has concluded that "[t]he ways of an owner with tangible property are such that he usually arranges means to learn of any direct attack upon his possessory or proprietary rights." *Mullane*, 339 U. S., at 316. Consistent with this observation, Arkansas was free to "indulge the assumption" that petitioner had either provided the State taxing authority with a correct and up-to-date mailing address—as required by state law—"or that he . . . left some caretaker under a duty to let him know that [his property was] being jeopardized."[3] *Ibid.*

―――――――

[2] The Court found inadequate the State's attempt at notice by publication, as if that were the State's *sole* method for effectuating notice, see *ante*, at 16. But the State plainly used it here as a *secondary* method of notice.

[3] The issue is not, as the Court maintains, whether the current occupant is "charged with acting as the owner's agent." *Ante*, at 12. Rather, the issue is whether petitioner discharged his *own* duty to guard his interests.

The Court does not conclude that certified mail is inherently insufficient as a means of notice, but rather that "the government's knowledge that notice pursuant to the normal procedure was ineffective triggered an obligation on the government's part to take additional steps to effect notice." *Ante*, at 9. I disagree.

First, whether a method of notice is reasonably calculated to notify the interested party is determined *ex ante, i.e.,* from the viewpoint of the government agency at the time its notice is sent. This follows from *Mullane*, where this Court rested its analysis on the information the sender had "at hand" when its notice was sent. 339 U. S., at 318. Relatedly, we have refused to evaluate the reasonableness of a particular method of notice by comparing it to alternative methods that are identified after the fact. See *Dusenbery*, 534 U. S., at 171–172. Today the Court appears to abandon both of these practices. Its rejection of Arkansas' selected method of notice—a method this Court has repeatedly concluded is constitutionally sufficient—is based upon information that was unavailable when notice was sent. Indeed, the Court's proposed notice methods— regular mail, posting and addressing mail to "occupant," *ante*, at 12–14—are entirely the product of *post hoc* considerations, including the discovery that members of petitioner's family continued to live in the house. Similarly, the Court's observation that "[t]he Commissioner['s] complain[t] about the burden of . . . additional steps . . . is belied by Arkansas' current requirement that notice to homestead-owners be accomplished by personal service if certified mail is returned," *ante,* at 14–15, is contrary to *Dusenbery*'s "conclusion that the Government ought not be penalized and told to 'try harder' . . . simply because [it] has since upgraded its policies," 534 U. S., at 172 (citation omitted).

Second, implicit in our holding that due process does not require "actual notice," see *id.,* at 169–170, is that when

the "government becomes aware . . . that its attempt at notice has failed," *ante,* at 5, it is not required to take additional steps to ensure that notice has been received. Petitioner's challenge to Arkansas' notice methods, and the Court's acceptance of it, is little more than a thinly veiled attack on *Dusenbery.* Under the majority's logic, each time a doubt is raised with respect to whether notice has reached an interested party, the State will have to consider additional means better calculated to achieve notice. Because this rule turns on speculative, newly acquired information, it has no natural end point, and, in effect, requires the States to achieve something close to actual notice. The majority's new rule is contrary to *Dusenbery* and a significant departure from *Mullane.*

The only circumstances in which this Court has found notice by mail and publication inadequate under the Due Process Clause involve situations where the state or local government knew at the outset that its notice efforts were destined to fail and knew how to rectify the problem prior to sending notice. See *Robinson* v. *Hanrahan,* 409 U. S. 38, 39 (1972) *(per curiam)* (intended recipient known to be in jail)*; Covey* v. *Town of Somers*, 351 U. S. 141, 145 (1956) (intended recipient known to be incompetent and without a guardian).

In *Robinson*, the State, having arrested petitioner and detained him in county jail, immediately instituted forfeiture proceedings against his automobile and mailed notice of those proceedings to his residential address. 409 U. S., at 38. Robinson, who was incarcerated in the county jail during the entirety of the forfeiture proceedings, did not receive notice of the proceedings until after he was released and the forfeiture order had been entered. *Id.*, at 38–39. Because the State knew beforehand that Robinson was not at, and had no access to, the address to which it sent the notice, this Court held that the State's efforts were not "reasonably calculated" to notify him of the pend-

ing proceedings. *Id.,* at 40. Similarly, in *Covey*, the Court concluded that the methods of notice used by the town— mailing, posting, and publishing—were not reasonably calculated to inform Covey of proceedings adverse to her property interests because local officials knew prior to sending notice that she was "without mental capacity to handle her affairs" and unable to comprehend the meaning of the notices. 351 U. S., at 144, 146.

By contrast, Arkansas did not know at the time it sent notice to petitioner that its method would fail; and Arkansas did not know that petitioner no longer lived at the record address simply because letters were returned "unclaimed." Pet. for Cert. 3. "[U]nclaimed" does not necessarily mean that an address is no longer correct; it may indicate that an intended recipient has simply failed or refused to claim mail. See United States Postal Service, Domestic Mail Manual (DMM), §507, Exh. 1.4.1, http://pe.usps.gov/text/dmm300/507.htm.[4] Given that the State had been using the address provided by petitioner and that petitioner had a legal duty to maintain a current mailing address with the state taxing authority, return of the mail as "unclaimed" did not arm Arkansas with the type of specific knowledge that the governments had at hand in *Robinson* and *Covey*. Cf. *ante,* at 13. The State cannot be charged to correct a problem of petitioner's own creation and of which it was not aware.[5]

---

[4] The Postal Service uses "Moved, Left No Address" to indicate that the "[A]ddressee moved and filed no change-of-address order," and "Not Deliverable as Addressed—Unable to Forward" to indicate that the mail is "undeliverable at address given; no change-of-address order on file; forwarding order expired." DMM §507, Exh. 1.4.1.

[5] The Court's "storm drain" hypothetical, *ante*, at 7–8, presents the harder question of when notice is sent—at the precise moment the Commissioner places the mail in the postal carrier's hand or the split second later when he observes the departing carrier drop the mail down the storm drain. That more difficult question is not before us in this case because Arkansas learned long after the fact that its attempts had been unsuccessful.

Even if the State had divined that petitioner was no longer at the record address, its publication of notice in a local newspaper would have sufficed because *Mullane* authorizes the use of publication when the record address is unknown. See 339 U. S., at 316 ("[P]ublication traditionally has been acceptable as notification supplemental to other action which in itself may reasonably be expected to convey a warning").

## II

The Court's proposed methods, aside from being constitutionally unnecessary, are also burdensome, impractical, and no more likely to effect notice than the methods actually employed by the State.

In Arkansas, approximately 18,000 parcels of delinquent real estate are certified annually. *Tsann Kuen Enterprises Co.* v. *Campbell*, 335 Ark. 110, 119–120, 129 S. W. 3d 822, 828 (2003). Under the Court's rule, the State will bear the burden of locating thousands of delinquent property owners. These administrative burdens are not compelled by the Due Process Clause. See *Mullane, supra*, at 313–314; *Tulsa Professional Collection Services, Inc.,* 485 U. S., at 489–490 (stating that constitutionally sufficient notice "need not be inefficient or burdensome"). Here, Arkansas has determined that its law requiring property owners to maintain a current address with the state taxing authority, in conjunction with its authorization to send property notices to the record address, is an efficient and fair way to administer its tax collection system. The Court's decision today forecloses such a reasonable system and burdens the State with inefficiencies caused by delinquent taxpayers.

Moreover, the Court's proposed methods are no more reasonably calculated to achieve notice than the methods employed by the State here. Regular mail is hardly foolproof; indeed, it is arguably less effective than certified mail. Certified mail is tracked, delivery attempts are

recorded, actual delivery is logged, and notices are posted to alert someone at the residence that certified mail is being held at a local post office. By creating a record, these features give parties grounds for defending or challenging notice. By contrast, regular mail is untraceable; there is no record of either delivery or receipt. Had the State used regular mail, petitioner would presumably argue that it should have sent notice by certified mail because it creates a paper trail.[6]

The Court itself recognizes the deficiencies of its proposed methods. It acknowledges that "[f]ollowing up with regular mail *might* . . . increase the chances of actual notice"; "occupants who ignored certified mail notice slips . . . *might* scrawl the owner's new address on the notice packet," *ante*, at 12; and "a letter addressed to [occupant] *might* be opened and read," *ante*, at 14 (emphasis added). Nevertheless, the Court justifies its redrafting of Arkansas' notice statute on the ground that "[its] approach[es] would increase the likelihood that the owner would be notified that he was about to lose his property . . . ." *Ibid.* That, however, is not the test; indeed, we rejected such reasoning in *Dusenbery*. See 534 U. S., at 171 (rejecting the argument that "the FBI's notice was constitutionally flawed

---

[6] Interestingly, the Court stops short of saddling the State with the other steps that petitioner argues a State should take any time the interested party fails to claim letters mailed to his record address, see *ante*, at 14, namely searching state tax records, the phone-book, the Internet, department of motor vehicle records, or voting rolls, contacting his employer, or employing debt collectors. Here, the Court reasons that because of the context—the fact that the letter was returned merely "unclaimed" and petitioner had a duty to maintain a current address—the State is not required to go as far as petitioner urges. *Ibid.* Though the methods proposed by petitioner are severely flawed (for instance, the commonality of his surname "Jones" calls into question the fruitfulness of Internet and phone-book searches), there is no principled basis for the Court's conclusion that petitioner's other proposed methods would "impos[e] burdens on the State significantly greater than the several relatively easy options outlined [by the Court]." *Ibid.*

because it was 'substantially less likely to bring home notice' than a feasible substitute" (citations omitted)).

The Court's suggestion that Arkansas post notice is similarly unavailing. The State's records are organized by legal description, not address, which makes the prospect of physically locating tens of thousands of properties every year, and posting notice on each, impractical. See *Tsann Kuen Enterprises Co., supra,* at 119–120, 129 S. W. 3d, at 828. Also, this Court has previously concluded that posting is an inherently unreliable method of notice. See *Greene* v. *Lindsey*, 456 U. S. 444, 453–454 (1982).

Similarly, addressing the mail to "occupant," see *ante,* at 13, is no more reasonably calculated to reach petitioner. It is sheer speculation to assume, as the Court does, that although "[o]ccupants . . . might disregard a certified mail slip . . . , a letter addressed to them (even as 'occupant') might be opened and read." *Ante*, at 14. It is at least as likely that an occupant who receives generically addressed mail will discard it as junk mail.

## III

If "title to property should not depend on [factual] vagaries," *Dusenberry, supra,* at 171, then certainly it cannot turn on "wrinkle[s]," *ante*, at 5, caused by a property owner's own failure to be a prudent ward of his interests. The meaning of the Constitution should not turn on the antics of tax evaders and scofflaws. Nor is the self-created conundrum in which petitioner finds himself a legitimate ground for imposing additional constitutional obligations on the State. The State's attempts to notify petitioner by certified mail at the address that he provided and, additionally, by publishing notice in a local newspaper satisfy due process. Accordingly, I would affirm the judgment of the Arkansas Supreme Court.